Filed 5/20/21

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA



| | |
|---|---|
| SMART CORNER OWNERS ASSOCIATION, Plaintiff and Appellant, v. CJUF SMART CORNER LLC et al., Defendants and Respondents. | D076775 (Super. Ct. No. 37-2017-00037690-CU-CD-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Styn, Judge. Reversed and remanded with directions.

Epsten, Anne L. Rauch, Trinette S. Sachrison, Gordon A. Walters; Kasdan Lippsmith Weber Turner, Kenneth S. Kasdan, Michael D. Turner and Brittany L. Grunau for Plaintiff and Appellant.

Lorber, Greenfield & Polito, Bruce W. Lorber, Robert B. Titus; McCormick, Barstow, Sheppard, Wayte & Carruth and Scott M. Reddie for Defendants and Respondents.

INTRODUCTION

Plaintiff Smart Corner Owners Association (the Association), a California nonprofit mutual benefit corporation, filed a construction defect action against the developers of a residential condominium tower.  In 2019, the trial court granted the developers' motion for summary judgment on the ground that the Association failed to obtain the consent of more than 50 percent of its condominium owner members *before* filing the instant action as required by the governing declaration of covenants, conditions, and restrictions (CC&Rs).  In concluding the Association's complaint was invalid, the court rejected the Association's argument that a subsequent vote of ratification, held after the filing of the operative complaint, could satisfy the member consent requirement.  The court applied the holding of *Branches Neighborhood Corp. v. CalAtlantic Group, Inc.* (2018) 26 Cal.App.5th 743 (*Branches*), which involved a similar member vote requirement, and also resulted in dismissal of an association's construction defect claims.

After the Association filed its notice of appeal, the Legislature enacted Civil Code section 5986,[1] effective January 1, 2020.  Section 5986 renders prelitigation member vote requirements—like those at issue here and in *Branches*—null and void.  The newly enacted statute abrogates the defense that noncompliance with such conditions defeats a construction defect claim. (§ 5986, subd. (b).)  The Legislature also expressly provided the statute would apply retroactively "to claims initiated before the effective date of this section, except if those claims have been resolved through an executed settlement, a final arbitration decision, or *a final judicial decision on the merits*."  (§ 5986, subd. (d), italics added.)

---

[1]     All undesignated statutory references are to the Civil Code unless otherwise specified.

2

The Association seeks reversal of the judgment on the ground that its claims had not yet been resolved through a "final judicial decision on the merits" when section 5986 became effective, and it is therefore entitled to the benefits of the new legislation. It also contends the prelitigation vote requirement violates state public policy. We agree.

We conclude a "final judicial decision on the merits" within the meaning of section 5986, subdivision (d), does not encompass a judgment that was not final on appeal as of the statute's effective date. Section 5986 therefore applies retroactively to the Association's claims and compels reversal of the judgment entered against it. We also hold, as an independent ground for reversal, that the prelitigation vote requirement at issue in this case violates fundamental state public policy. Accordingly, we reverse the judgment and direct the trial court to enter a new order denying the developers' motion for summary judgment.

FACTUAL AND PROCEDURAL BACKGROUND[2]

I.

*The Smart Corner Project*

CJUF Smart Corner, LLC (CJUF), Canyon-Johnson Realty Advisors, LLC, Canyon-Johnson Urban Fund, LP, Smart Corner, LLC (collectively, the CJUF Group), and Lankford & Associates, Inc. (together with the CJUF

---

[2]     Consistent with the standard of review that applies to an order granting summary judgment, we present the facts in the light most favorable to the Association as the nonmoving party, "liberally construing [its] evidentiary submission while strictly scrutinizing [Developers'] own showing, and resolving any evidentiary doubts or ambiguities in [the Association's] favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768; *Light v. Dept. of Parks & Recreation* (2017) 14 Cal.App.5th 75, 81.)

3

Group, the Developers) are an associated group of real estate owners and developers.[3]  In 2004, CJUF contracted with Hensel Phelps Construction Company (Hensel Phelps) for the construction of the Smart Corner condominium project (Smart Corner or project) at 1080 Park Boulevard in downtown San Diego.  Smart Corner is a 19-story mixed-use development with 301 residential units and common areas.

On May 24, 2007, the project architect issued its certificate of substantial completion for the project.  On May 24, the City of San Diego (the City) issued a temporary certificate of occupancy for the project, although this temporary certificate of occupancy was not extended and lapsed after 30 days.  As of May 24, all but 25 of the project's residential units lacked flooring or appliances and could not be lawfully occupied.  As of May 24, the City had not yet completed its inspections of the project.  Structural, fire alarm, fire sprinklers, and electrical inspections were completed after May 24.

On July 6, 2007, the building failed its electrical system inspection.  On July 10, the building failed structural inspection; it did not pass structural inspection until July 17.  The City issued certificates of occupancy for 25 residential units and the common areas on July 6, and for the project generally on July 17.  The City continued to issue certificates of occupancy for the remaining residential units in the months that followed.  On July 10, 2007, CJUF recorded a notice of completion for the project.

---

[3]    CJUF was the developer of the Smart Corner project.  Canyon-Johnson Urban Fund, LP is a member and 85 percent owner of CJUF.  Smart Corner, LLC is a member and 15 percent owner of CJUF.  Canyon-Johnson Realty Advisors, LLC is the general partner of Canyon-Johnson Urban Fund, LP.  Lankford & Associates, Inc. entered into a development agreement with CJUF to provide development services for the project.

On August 27, 2007, CJUF, as declarant,[4] caused an amended and restated declaration of CC&Rs to be recorded for Smart Corner. Among the enumerated powers of the Association was the power under section 4.3.11 of the CC&Rs to "initiate, defend, release, settle or intervene in mediation, arbitration, judicial or administrative proceedings on behalf of the Association in matters pertaining to . . . any and all claims, causes of action, damages and suits for defects relating in any way to the design or construction of the Association Property or Common Area or any portion thereof, on behalf of the Owners . . . ."

Before the Association could initiate an action against CJUF, however, the Association was required to comply with a prelitigation vote provision set forth in section 4.4.4 of the CC&Rs (section 4.4.4), which stated:

> "Members' Approval of Certain Actions. In the event that any claim or other actions brought by the Association against Declarant, including, but not limited to, claims brought under California Civil Code Section 895 *et seq.*, or any other applicable laws involving allegations of construction defects relating to the Association Property or the Common Area that are not resolved pursuant to the non-adversarial procedures set forth in California Civil Code Sections 910 through 938, *the Association shall not*

---

[4] The CC&Rs defined "declarant" to mean CJUF as well as its successors or assigns, "if such successors and assigns acquire any or all of Declarant's interest in the Property for the purpose of purchase or sale, excluding any Owners, and Declarant has expressly transferred or assigned to such successors or assigns its rights and duties as Declarant to a portion or all of the Project. For any successor or assignee of 'Declarant' to be deemed a Declarant under the terms of this Declaration, Declarant shall record in the County a certificate so designating said successor or assignee as Declarant."

*initiate a further action or procedure under Section 17.4* [5] *or otherwise without first obtaining the consent of the Owners* other than Declarant, *constituting more than fifty percent (50%) of the Owners of the Association* at a meeting or election of the Association conducted in accordance with the provisions of California Corporations Code Sections 7510 *et seq.* and 7613." (Italics added.)

## II.

### *The Construction Defect Action*

A.    *The Association's Notice of Construction Defect Claims*

On July 6, 2017, the Association provided the CJUF Group and Hensel Phelps with notice of a construction defect claim and notice of commencement of legal proceedings under sections 895, *et seq.* and 910, *et seq.* of the Right to Repair Act and section 6000 of the Davis-Stirling Common Development Act

---

5    Section 17.4, "Alternative Dispute Resolution," provided that "[t]he purpose of this Section 17.4 is to provide an expedited means of resolving any claims, disputes and disagreements which may arise between an Owner and the Association and Declarant after the close of escrow or other conveyance of any portion of the Property by Declarant concerning the Property, that are not resolved pursuant to any applicable statutory dispute resolution procedures (individually referenced to herein as 'Dispute' and collectively as 'Disputes.')."  It set forth provisions requiring mediation and arbitration of Disputes.

(Davis-Stirling Act).[6]  The notice included a preliminary list of numerous alleged defects, including defects in the project's exterior barrier coating, windows, door casings and doors, private decks, waterproofing, concrete, bathtubs and showers, roof membrane and roof flashing, roof laps and seals, tower floors, plumbing, venting, garage, and parking structure.

On September 5, 2017, the parties stipulated to extend until September 29 the deadline for completing statutory prelitigation requirements for conducting a first visual inspection, and for the Developers' service of responses to the Association's request for documents and production of documents to the Association.  On September 27, the CJUF Group and Hensel Phelps notified the Association of their election to opt out of the Right to Repair Act and Davis-Stirling Act prelitigation procedures.

On October 6, 2017, the Association filed a complaint against the CJUF Group and Hensel Phelps, alleging causes of action for negligence, strict liability, breach of warranties, and violation of construction standards set forth in sections 896, *et seq*.  In its operative first amended complaint filed February 14, 2018, the Association asserted a single cause of action against

---

[6]     The Davis-Stirling Act was enacted in 1985 and "consolidated the statutory law governing condominiums and other common interest developments."  (*Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73, 81 (*Villa De Las Palmas*).)  The Davis-Stirling Act is now codified at sections 4000 to 6150 of the Civil Code, formerly sections 1350 to 1376.  (See *Rancho Mirage Country Club Homeowners Assn. v. Hazelbaker* (2016) 2 Cal.App.5th 252, 258.)  Section 6000 imposes requirements with which an association must comply before filing construction defect claims against a builder, developer, or general contractor of a common interest development.  (See § 6000, subds. (a) - (r).)  Service of a notice of commencement of legal proceedings under section 6000 tolls all applicable statutes of limitation and repose.  (§ 6000, subd. (b).)

the Developers[7] and Hensel Phelps for violation of construction defect standards under section 896, *et seq*.

In their respective answers to the first amended complaint, the Developers asserted defenses based on the Association's alleged non-compliance with CC&R requirements for maintaining a claim, and based on the running of the statute of repose in section 941, subdivision (a).[8]

On May 14, 2018, the Association filed the declaration of its attorney, David Peters, who averred that while the Association did not agree that the prelitigation voting provision in section 4.4.4 was enforceable, "by February 15, 2018, more than a majority of the members voted: (1) in favor [of] making a claim under Article IV, Section 4.4.4, (2) filing a lawsuit and/or (3) to ratify any past actions by the Board regarding the pursuant [*sic*] of construction defect claims against the Declarant and other responsible entities."

B.    *The Branches Decision*

On August 24, 2018, Division Three of the Fourth District Court of Appeal published *Branches*, a case involving alleged noncompliance with a pre-claim vote requirement in the CC&Rs of a residential condominium development. (*Branches*, *supra*, 26 Cal.App.5th at p. 749.) The association filed a demand for arbitration of construction defect claims against a developer without first obtaining the vote of at least 51 percent of its

_____

[7]    Lankford & Associates, Inc. was not named as a defendant in the first amended complaint. It was added as a defendant on October 18, 2018, when the Association filed a Doe amendment substituting it as Doe 1 to the first amended complaint.

[8]    Subdivision (a) of section 941 provides, "[e]xcept as specifically set forth in this title, no action may be brought to recover under this title more than 10 years after substantial completion of the improvement but not later than the date of recordation of a valid notice of completion."

8

members as required by the community's CC&Rs.  (*Id.* at pp. 748–749.)  The association later held a membership meeting during which 92 of 93 members present voted to ratify the prosecution of the construction defect claim against the developer.  (*Id.* at p. 748.)

The developer moved for summary judgment on the ground that the association had failed to comply with the CC&Rs by obtaining owners' consent to arbitration *before* the claim was filed.  (*Branches*, *supra*, 26 Cal.App.5th at p. 749.)  The arbitrator agreed, reasoning that because the CC&Rs specified the requisite consent was to be obtained "prior to" initiating a claim, the later ratification vote was ineffective.  (*Ibid.*)  The trial court entered judgment confirming the arbitration award.

On appeal, the association argued the arbitrator had exceeded his powers by issuing an award that violated the association's " 'unwaivable' " statutory right to ratification.  (*Branches*, *supra*, 26 Cal.App.5th at p. 751.)  The appellate court found that none of the statutes cited by the association established a right to ratification or prevented an association's CC&Rs from requiring member approval "[p]rior to" the board instituting a legal claim. (*Id.* at pp. 753–757.)

The *Branches* court also rejected the association's position that the arbitrator's decision violated state public policy favoring ratification. (*Branches*, *supra*, 26 Cal.App.5th at pp. 757–758.)  Rather, the court concluded public policy favored placing limits on the authority of community development associations.  (*Id.* at pp. 757–758, citing §§ 4065, 4070, 4230, 4350, 4360, 4365, 5300, 5305, 5310 & 6150.)

The *Branches* court found particular relevance in section 6150, which requires notice to the membership and a meeting before legal action may be instituted against a developer.  (*Branches*, *supra*, 26 Cal.App.5th at p. 758.)

In the court's view, the member voting requirement in the CC&Rs merely went "a step further" than section 6150 by "requiring affirmative consent of a quorum of the members 'prior to' instituting such action." (*Ibid.*)  It viewed the member voting requirement to be "consistent with the aims of the [Davis-Stirling] Act—to balance the association's need to operate efficiently with the rights of its members to be informed and participate in decisions that could impact the association for years, if not decades, to come." (*Ibid.*)  The court further stated:  "[The association] would have us believe that there is a 'right to ratify' after the fact, as if that confers some benefit on the owners.  It does not; it ignores their explicit right to consent beforehand, before a road has been taken that will be difficult, expensive, and time consuming." (*Ibid.*)  Accordingly, the court affirmed confirmation of the arbitrator's award dismissing the association's construction defect claims.  (*Ibid.*)

C.    *The Developers' Motion for Summary Judgment*

In December of 2018, the Developers moved for summary judgment, arguing there were no disputed issues of fact and the first amended complaint failed as a matter of law, on two independent grounds.  First, they argued the statute of repose under section 941, subdivision (a), had started to run on May 24, 2007, which they argued was the date of substantial

completion of the project using the prime construction contract's definition of "substantial completion,"[9] and the action was therefore time-barred.

Second, relying on *Branches*, the Developers argued the complaint was "invalid" because the Association had filed it without first obtaining consent from the majority of its members, as required by section 4.4.4. They further argued strict compliance with the CC&Rs was required under *Branches* and therefore the February 15, 2018 member ratification vote was ineffective to cure the original noncompliance. The Developers also claimed that because the original complaint was invalid, the statute of repose had continued to run and had lapsed, such that the Association had no time remaining in which to bring a valid action based on the February 15 vote of ratification.

The Association opposed the Developers' motion for summary judgment. First, in response to the Developers' statute of repose defense, the Association argued the date of "substantial completion" for purposes of section 941, subdivision (a), could not be contractually defined. The Association also submitted evidence that it argued created triable issues of fact as to whether the prime contract definition of "substantial completion" had been satisfied by May 24, 2007. This evidence included that as of May 24, most units could not be lawfully occupied; the building had failed certain

---

9    According to the Developers' summary judgment motion, "substantial completion" was defined in the prime contract as occurring "when: (1) the Work is sufficiently complete in accordance with the Contract Documents to permit lawful occupancy and use thereof for its intended purpose, (2) a temporary certificate of occupancy has been issued, (3) all Project utilities have been installed and approved, (4) the Architect has issued its Certificate of Substantial Completion, and (5) the Contractor has certified that all remaining work will not interfere with the Owner's use of the Project and is capable of being completed within sixty (60) calendar days."

11

inspections; subcontractors had not completed their work; and certificates of occupancy were yet to be issued for most of the residential units.

Second, the Association argued that its complaint had not been invalidated by alleged noncompliance with section 4.4.4. It claimed section 4.4.4 applied only to initiation of a mediation or arbitration, and not to the filing of a civil action in superior court. It further argued that section 4.4.4 was unenforceable because it was procedurally and substantively unconscionable. Section 4.4.4 had "maximum procedural unconscionability," the Association argued, because it was drafted before the Association came into existence and was therefore akin to a contract of adhesion. And it was substantively unconscionable because it forced the Association to "jump over unnecessary hurdles before it can prosecute a claim against the Declarant for construction defects."

Finally, the Association argued the February 15, 2018 vote of ratification by a majority of its members was effective to meet the member consent requirement. The Association asserted that to the extent section 4.4.4 precluded members from validating board actions through ratification, it violated public policy and amounted to an unreasonable servitude within the meaning of section 5975, subdivision (a).[10] It argued *Branches* was not dispositive of its right to comply with a member consent requirement through ratification, because the court in *Branches* considered only the narrow issue of whether the arbitrator had exceeded his powers by violating an "unwaivable" right of ratification, and had not been called to consider more

_____

[10]    Civil Code section 5975, subdivision (a), provides, in part, that "[t]he covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the benefit of and bind all owners of separate interests in the development."

12

generally the scope of an association's ability to cure non-compliance with CC&Rs through ratification of board decisions.

D.    *The Trial Court's Ruling*

On July 22, 2019, the trial court issued a written ruling granting in part and denying in part the Developers' motion for summary judgment.[11] The court denied the motion insofar as it was based on the alleged running of the statute of repose. The court was unpersuaded that the agreed definition of "substantial completion" in the construction contract governed interpretation of section 941, subdivision (a). Even assuming the contractual definition applied, the court found the Developers had failed to establish an absence of triable issues of material fact that the project was substantially completed by May 24, based on the evidence submitted by the Association.

The court noted the parties agreed that absent establishing a date of substantial completion, the date of recording the notice of completion commences the running of the statute of repose under section 941, subdivision (a). The court further noted there was no dispute that the Association's notice of claim tolled the statute pursuant to section 927 and the Developers argued "the 10-year statute of repose, as tolled by [the Association's] Notice of Claim, ran on November 17, 2017." The court

_____

[11]    Hensel Phelps filed a motion for summary judgment that was described by the trial court as "substantially similar" to the summary judgment motion filed by the Developers. As we discuss in footnote 13, *post*, in the same written ruling in which it resolved the Developers' summary judgment motion, the court also ruled on Hensel Phelps's summary judgment motion.

13

concluded that under this analysis, the Association's original complaint was timely filed on October 6, 2017.[12]

The court found merit, however, in the Developers' contention that the action was barred for noncompliance with section 4.4.4. The court found *Branches* controlling. It rejected the Association's contention that the holding of *Branches* should be confined to cases involving confirmation of an arbitration award. Rather, "*Branches* analyzes the substantive, legal issue of enforcement of a CC&R member consent requirement and, as such, applies irrespective of the forum." "Under *Branches*," the court concluded, "Plaintiff's failure to obtain the requisite consent of the membership prior to bringing this action against the [Developers] renders [the Association's] original complaint invalid. The First Amended Complaint was also filed before [the Association] obtained membership approval. Thus, the First Amended Complaint is also invalid." The court also rejected the Association's public

---

[12]    Section 927 provides: "If the applicable statute of limitations has otherwise run during this process, the time period for filing a complaint or other legal remedies for violation of any provision of this title, or for a claim of inadequate repair, is extended from the time of the original claim by the claimant to 100 days after the repair is completed, whether or not the particular violation is the one being repaired. If the builder fails to acknowledge the claim within the time specified, elects not to go through this statutory process, or fails to request an inspection within the time specified, the time period for filing a complaint or other legal remedies for violation of any provision of this title is extended from the time of the original claim by the claimant to 45 days after the time for responding to the notice of claim has expired. If the builder elects to attempt to enforce its own nonadversarial procedure in lieu of the procedure set forth in this chapter, the time period for filing a complaint or other legal remedies for violation of any provision of this part is extended from the time of the original claim by the claimant to 100 days after either the completion of the builder's alternative nonadversarial procedure, or 100 days after the builder's alternative nonadversarial procedure is deemed unenforceable, whichever is later."

14

policy and ratification arguments on the ground that identical arguments had been rejected in *Branches*.

The court also rejected the Association's contention that section 4.4.4 did not apply to civil claims, reasoning that the words " 'or otherwise' " in section 4.4.4 were unambiguous and made clear the provision applied to civil actions and not only to mediation or arbitration. Finally, the court found the Association failed to establish that section 4.4.4 was procedurally unconscionable based on *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223 (*Pinnacle*),[13] and that both procedural and substantive unconscionability were required to render the provision unenforceable.

---

[13] In *Pinnacle*, the California Supreme Court explained that even if CC&Rs could "perhaps be viewed as adhesive, a developer's procedural compliance with the Davis-Stirling Act provides a sufficient basis for rejecting an association's claim of procedural unconscionability." (*Pinnacle, supra,* 55 Cal.4th at p. 248.)

On August 14, 2019, the court entered judgment for the Developers. On August 15, the Developers filed a notice of entry of judgment. The Association filed its notice of appeal on September 26.[14]

### III.

### *Enactment of Section 5986*

A.   *Senate Bill No. 326 (2019–2020 Reg. Sess.)*

On August 30, 2019, after passage by the Legislature, the Governor signed Senate Bill No. 326 (2019–2020 Reg. Sess.) (Senate Bill 326), which added section 5986 to the Davis-Stirling Act, effective January 1, 2020. (Stats. 2019, ch. 207, § 2.)  The new legislation nullifies prelitigation member vote provisions like those at issue here and in *Branches* and eliminates the assertion of noncompliance with such requirements as a defense to construction defect actions.  (See § 5986, subd. (b).)

---

[14]   In the same July 22, 2019 minute order in which the trial court granted in part and denied in part the Developers' motion for summary judgment, the court also denied Hensel Phelps's summary judgment motion in its entirety. Hensel Phelps then petitioned this court for a writ of mandate directing the trial court to vacate its order denying the motion and enter an order granting the motion.  (*Hensel Phelps Construction Co. v. Superior Court* (2020) 44 Cal.App.5th 595, 601 (*Hensel Phelps*).)  Hensel Phelps "primarily argued that the date of substantial completion adopted by the parties to the contract 'conclusively establishe[d]' the date of substantial completion" under section 941, subdivision (a).  (*Hensel Phelps,* at p. 601.)  In *Hensel Phelps*, another panel of this court denied the petition, holding the terms of the construction contract did not conclusively establish the date of substantial completion under section 941, and that "[s]ubstantial completion under the statute is a factual issue, to be determined by the trier of fact based on competent evidence concerning the actual state of construction of the improvement." (*Hensel Phelps,* at p. 616.)

16

The analysis in support of Senate Bill 326 described the need for section 5986.[15] Section 5986 was enacted to "*ensure[ ] that developers cannot use the governing structure of a homeowners association to escape liability.*" (Assem. Com. on Judiciary, Analysis of Sen. Bill 326, as amended June 24, 2019, p. 9.) One legislative analysis report explained:

> "As part of the creation of a new HOA, the developer typically begins laying the groundwork for the HOA's future self-governance. This includes establishing the initial governing documents for the HOA, including the HOA's 'declaration' [of] covenants, conditions, and restrictions (CCRs). While the HOA developer is still selling off the separate properties within the HOA to homeowners, it is also common for the developer to serve, or appoint people to serve, on the HOA board of directors. In these ways, HOA developers exercise a great deal of control over how the HOA will operate going forward, even though, over time, the developer's direct involvement with the HOA typically fades away.

---

[15] On April 2, 2021, we granted the Association's unopposed amended motion for judicial notice as to the following materials from the legislative history of Senate Bill 326, which were presented as separate exhibits: Exhibits A through G to the Association's amended motion (consisting of proposed and amended versions of Sen. Bill 326); Exhibit H (Sen. Com. on Judiciary, Analysis of Sen. Bill 326, Mar. 27, 2019); Exhibit I (Sen. Com. on Housing, Analysis of Sen. Bill 326, Mar. 27, 2019); Exhibit K (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill 326, as amended May 1, 2019); Exhibit L (Assem. Com. on Housing and Community Development, Analysis of Sen. Bill 326, as amended June 12, 2019); Exhibit M (Assem. Com. on Housing and Community Development, Background Information Request for Sen. Bill 326); Exhibit N (Assem. Com. on Judiciary, Analysis of Sen. Bill 326, as amended June 24, 2019); Exhibit O (Assem. Judiciary Com., Mandatory Information Worksheet on Sen. Bill 326) Exhibit P (Assem. Com. on Housing and Community Development, 3d reading analysis of Sen. Bill 326, as amended July 3, 2019); and Exhibit Q (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill 326, as amended July 3, 2019).

"The involvement of HOA developers in the creation of the HOA's initial government documents and the appointment of early HOA board members can sometimes create conflicts of interest because the HOA and the developer's interests are not necessarily aligned.

"[T]his bill addresses one such circumstance. In drafting the governing documents for the HOAs they are creating, developers sometimes add provisions that make it quite difficult for the HOA to sue the developer in the event that construction defects are discovered at the HOA. [¶] While it could be argued that requiring a vote of the HOA members prevents the board of directors from spending the HOA's money on legal disputes without the support of the members, *the fact that these provisions are limited to construction defect claims against the developer suggests that more is afoot.* Moreover, Civil Code Section 6150 already provides some protections against an overly litigious board bent on suing the developer: it requires an HOA board to hold a meeting of the members 30 days prior to filing a lawsuit, stating its reasoning and laying out the options available to the HOA. [¶] *This bill ensures that developers cannot reap the benefit of having taken advantage of their participation in the creation of the HOA in this way*." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill 326, as amended May 1, 2019, pp. 6–7, italics added.)

Proponents of Senate Bill 326 pointed out that the bill "would be consistent with a recent Supreme Court of Massachusetts ruling that invalidated governing document provisions designed to inoculate the developer against construction defect claims. That court found such provisions to be void as against public policy, writing: [¶] '[i]t is overreaching for a developer to impose a condition precedent that, for all practical purposes, makes it extraordinarily difficult or even impossible for the [Board of Directors] to initiate any litigation against the developers regarding the common areas and facilities of a condominium. Such a provision has all the same flaws as a waiver of liability provision — which we would find void as

18

contravening public policy — but without the transparency of such a provision.' (*Trustees of the Cambridge Point Condominium Trust v. Cambridge Point, LLC* (2018) 478 Mass. 697, 709[(*Cambridge Point*)].)" (Sen. Com. on Judiciary, Analysis of Sen. Bill 326, Mar. 27, 2019, p. 10.)

The legislative materials described developer-inserted preconditions to litigation as " '*poison pill*' " provisions that "*make it prohibitively difficult for HOAs to pursue claims against [developers].*" (Assem. Judiciary Com., Mandatory Information Worksheet on Sen. Bill 326, pp. 1–2.) *Branches* was cited as an example of a developer using such a provision to its benefit. (Assem. Judiciary Com., Mandatory Information Worksheet on Sen. Bill 326, pp. 1–3.)

B.    *Section 5986*

Section 5986 has five subdivisions. Subdivision (a) confers the board of an association with authority to commence and pursue a legal proceeding against a declarant, developer, or builder of a common interest development, and vests that authority solely in those board members that are unaffiliated with the declarant, developer, or builder. (See § 5986, subd. (a).)

Subdivision (b) reads as follows: "The governing documents shall not impose any preconditions or limitations on the board's authority to commence and pursue any claim, civil action, arbitration, prelitigation process pursuant to Section 6000 or Title 7 (commencing with Section 895) of Part 2 of Division 2, or other legal proceeding against a declarant, developer, or builder of a common interest development. Any limitation or precondition, including, but not limited to, requiring a membership vote as a prerequisite to, or otherwise providing the declarant, developer, or builder with veto authority over, the board's commencement and pursuit of a claim, civil action, arbitration, prelitigation process, or legal proceeding against the declarant, developer, or

19

builder, or any incidental decision of the board, including, but not limited to, retaining legal counsel or incurring costs or expenses, is unenforceable, null, and void. *The failure to comply with those limitations or preconditions, if only, shall not be asserted as a defense to any claim or action described in this section.*" (Italics added.)

Subdivision (c) of section 5986 provides that provisions imposing limitations or preconditions on the board's authority to initiate claims are valid and enforceable if "adopted solely by the nondeclarant affiliated members of the association . . . in accordance with the requirements necessary to amend the governing documents of the association."

Subdivision (d) states: "This section applies to all governing documents, whether recorded before or after the effective date of this section, and applies retroactively to claims initiated before the effective date of this section, *except if those claims have been resolved through an executed settlement, a final arbitration decision, or a final judicial decision on the merits.*" (Italics added.)

Subdivision (e) provides, in part, that "[n]othing in this section extends any applicable statute of limitation or repose to file or initiate any claim, civil action, arbitration, prelitigation process, or other legal proceeding."

## DISCUSSION

The Association contends section 5986 applies retroactively to this case and compels reversal of the trial court's order granting summary judgment to the Developers based on its failure to obtain a membership vote before filing its complaint under section 4.4.4 of the CC&Rs. It argues its claims had not been resolved by "final judicial decision on the merits" within the meaning of subdivision (d) when section 5986 became effective on January 1, 2020, and

20

that they are therefore not excluded from the general rule of retroactivity in subdivision (d). The Association also seeks reversal on the ground that section 4.4.4 is unenforceable because it violates public policy to the extent it does not allow its members to consent to litigation by a vote of ratification.

The Developers argue the benefits of section 5986 are unavailable to the Association because this action was resolved in a "final judicial decision on the merits" before the effective date of the statute, when the trial court entered judgment on August 14, 2019. The Developers also claim section 4.4.4 is not violative of fundamental state public policy, even if it excludes the possibility of members consenting to construction defect litigation through a vote of ratification.

I.

*"Final Judicial Decision on the Merits" Means Appellate Finality*

A.     *Standard of Review*

A trial court's grant of summary judgment is reviewed de novo. (*Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 326.) "On appeal from the granting of a motion for summary judgment, we examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) "The trial court's stated reasons for granting summary judgment are not binding because we review its ruling not its rationale." (*Canales v. Wells Fargo Bank, N.A.* (2018) 23 Cal.App.5th 1262, 1268 (*Canales*).) "To the extent issues on appeal from a summary judgment involve the interpretation of a statute, they are issues of law subject to independent review." (*City of Malibu v. Santa Monica Mts. Conservancy* (2002) 98 Cal.App.4th 1379, 1383; see *Bruns v. E-Commerce Exchange, Inc.*

21

(2011) 51 Cal.4th 717, 724 ["[s]tatutory interpretation is a question of law that we review de novo"]; *Sacks v. City of Oakland* (2010) 190 Cal.App.4th 1070, 1082 [where the pertinent facts are undisputed and the issue is one of statutory interpretation, " 'the question is one of law and we engage in a de novo review of the trial court's determination' "].)  The interpretation of the terms of CC&Rs is also subject to our independent review where, as here, the interpretation does not turn on the credibility of extrinsic evidence.  (*Harvey v. The Landing Homeowners Assn.* (2008) 162 Cal.App.4th 809, 817; *Starlight Ridge South Homeowners Assn. v. Hunter-Bloor* (2009) 177 Cal.App.4th 440, 445.)

B.    *Principles of Statutory Interpretation*

Civil statutes are presumed to operate prospectively "in the absence of a clear indication of a contrary legislative intent."  (*Quarry v. Doe 1* (2012) 53 Cal.4th 945, 955 (*Quarry*); see § 3 ["No part of [this code] is retroactive, unless expressly so declared."].)  "In construing statutes, there is a presumption against retroactive application unless the Legislature plainly has directed otherwise by means of ' "express language of retroactivity or . . . other sources [that] provide a clear and unavoidable implication that the Legislature intended retroactive application." ' "  (*Quarry,* at p. 955.)

The parties do not dispute that subdivision (d) of section 5986 is a clear expression of legislative intent for section 5986 to apply retroactively.  They also do not dispute the retroactive reach of section 5986 extends to claims that were initiated and that remained pending at the time the statute became effective.  Where they differ, however, is on the scope of pending claims to which the new legislation applies.

As we have noted, the dispute arises from the parties' disagreement over the meaning of the subdivision (d) phrase "final judicial decision on the

22

merits."  The Association contends that a judgment is not "final" under California law as long as it remains subject to appeal, and since its appeal was pending on January 1, 2020, when the statute became effective, its claims had not yet been resolved through a "final judicial decision" within the meaning of subdivision (d).  The Association also argues that "on the merits" in subdivision (d) means resolution "on substantive law grounds" and excludes claims terminated for failure to comply with a developer-drafted prelitigation vote requirement.

The Developers, unsurprisingly, offer a different interpretation of "final judicial decision on the merits."  Citing *Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 303–304 (*Sullivan*), they argue that "final" can refer to a trial court ruling that has become "final" because it has been reduced to judgment.  Under their view, the Association's claims were resolved by a "final judicial decision" when judgment was entered on August 14, 2019, before the effective date of section 5986, making section 5986 inapplicable to the Association's claims.  The Developers also contend that if a trial court "substantively" addresses whether voting requirements in CC&Rs were met, then its ruling is a decision "on the merits."

In *Aldea Dos Vientos v. CalAtlantic Group, Inc.* (2020) 44 Cal.App.5th 1073 (*Aldea*), Division Six of the Court of Appeal, Second Appellate District interpreted and applied the subdivision (d) phrase "final arbitration decision."  However, no court of review of this state has yet interpreted the phrase "final judicial decision on the merits."

Our goal in interpreting statutes is " 'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' "  (*Klein v. United States of America* (2010) 50 Cal.4th 68, 77 (*Klein*), quoting *Hassan v. Mercy American River*

23

*Hospital* (2003) 31 Cal.4th 709, 715.)  A step-by-step process of statutory interpretation has been developed by the courts of this state.  (See *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1396 (*Lopez*); *Alejo v. Torlakson* (2013) 212 Cal.App.4th 768, 786-787 (*Alejo*).)  The " 'key to statutory interpretation is applying the rules of statutory construction in their proper sequence . . . as follows:  "we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction." ' "  (*Lopez*, at p. 1396.)

In the initial step, we examine "the words of the statute, 'because the statutory language is generally the most reliable indicator of legislative intent.' "  (*Klein, supra*, 50 Cal.4th at p. 77.)  "When the statutory text is ambiguous, or it otherwise fails to resolve the question of its intended meaning," we proceed to the second step, and "look to the statute's legislative history and the historical circumstances behind its enactment."  (*Ibid.*)  "In this step, courts may 'turn to secondary rules of interpretation, such as maxims of construction, "which serve as aids in the sense that they express familiar insights about conventional language usage." ' "  (*Alejo, supra*, 212 Cal.App.4th at p. 787, quoting *Flannery v. Prentice* (2001) 26 Cal.4th 572, 579 (*Flannery*).)

" 'If ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretive process.  [Citation.]  In this phase of the process, we apply "reason, practicality, and common sense to the language at hand."  [Citation.]  Where an uncertainty exists, we must consider the consequences that will flow from a particular interpretation.' " (*Alejo, supra*, 212 Cal.App.4th at p. 788.)

C.    *Application to Section 5986*

    1.    *Step One—Plain Meaning*

In considering the text of section 5986, we give its words "a plain and commonsense meaning." (*Flannery*, *supra*, 26 Cal.4th at p. 577.)  In doing so, we do not "consider the statutory language in isolation"; "[r]ather, we look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . .' " (*Id.* at p. 578.)  "When statutory language includes words or terms that courts have previously construed, 'the presumption is almost irresistible' that the Legislature intended them to have the same 'precise and technical' meanings given by the courts." (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1046 (*Hughes*); accord, *Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.)  Thus, where the Legislature uses terms "that have a well-settled judicial construction," we may presume it intends "that the terms retain the same meaning that the courts have placed upon them . . . ." (*Hughes*, at p. 1046.)

With these concepts in mind, we consider the phrase "final judicial decision on the merits."  The words "on the merits" have an accepted legal meaning.  They refer to the substantive elements of a claim or defense, as distinguished from technical or procedural impediments to proceeding with a claim. (Black's Law Dict. (11th ed. 2019) p. 1185, col. 2 [defining "merits" as "[t]he elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points, esp[ecially] of procedure"].)  A ruling that a claim is time-barred under the statute of limitations, for example, is considered a " 'technical or procedural' " ground for disposing of a claim, rather than a determination " 'on the merits.' " (*Boyd v. Freeman* (2017) 18 Cal.App.5th 847, 856; *Koch v. Rodlin Enterprises* (1990) 223 Cal.App.3d 1591,

25

1596 ["Termination of an action by a statute of limitations is deemed a technical or procedural, rather than a substantive, termination. [Citation.] 'Thus . . . dismissal on limitations grounds is in no way dependent on nor reflective of the merits—or lack thereof—in the underlying action.' " ].)

Dismissal of a construction defect claim for failure to comply with the timing requirement of a condition precedent to suit is analogous to disposition on statute of limitations grounds, and is equally amenable to being described as a technical or procedural resolution rather than a resolution "on the merits." Although the Developers characterize a court's adjudication of the defense of noncompliance with a vote requirement as a "substantive" decision, they fail to cite any authority supporting their assertion, and we find it unpersuasive.

Moreover, when considered in light of the full text of section 5986 and its express intent to nullify prelitigation vote requirements and eliminate their use as a defense, it seems highly unlikely the Legislature would exclude from the statute's retroactive reach claims that are disposed of on the very defense it sought to abrogate. In *Aldea*, the court reasoned that the subdivision (d) phrase "on the merits" modified "final arbitration decision" as well as "final judicial decision," and concluded that an arbitral award dismissing an association's construction defect claim for failure to strictly comply with a member consent requirement "was not on the merits." (*Aldea*, *supra,* 44 Cal.App.5th at pp. 1079–1080.) We read the phrase similarly and conclude the Legislature included the phrase "on the merits" in subdivision (d) to indicate that claims terminated for noncompliance with prelitigation voting requirements were not meant to be excluded from the statute's retroactive reach.

26

Although we find the phrase "on the merits" unambiguous, we cannot say the same of the phrase "final judicial decision." The term "final," used as it is here to describe a "judicial decision," has more than one possible meaning. The Association cites *Manco Contracting Co. (W.L.L.) v. Bezdikian* (2008) 45 Cal.4th 192, 202 (*Manco Contracting*) for the proposition that "in California a judgment is not final and conclusive between the parties when it is on appeal, or for as long as it remains subject to appeal . . . ."

As the Developers point out, however, "finality on appeal is not the only meaning of the phrase 'final judgment.' " (*Sullivan, supra,* 15 Cal.4th at p. 303.) "In its most fundamental sense, 'finality' is an attribute of every judgment at the moment it is rendered; indeed, if a judicial determination is not immediately 'final' in this sense it is not a judgment, no matter what it is denominated. The Legislature has incorporated this meaning of finality into the very definition of a judgment: 'A judgment is the *final* determination of the rights of the parties in an action or proceeding.' (Code Civ. Proc., § 577, italics added.)." (*Id.* at p. 304.) "Finality in this sense not only makes a judicial determination a judgment, it also makes that judgment appealable." (*Ibid.*) The Developers thus argue the Association's claims were resolved by "final judicial decision" when the trial court's minute order granting their dispositive motion was reduced to judgment. Given the discussion in *Sullivan* of the different meanings of finality, we cannot disagree that "final" can reasonably mean finality after appeal, as advocated by the Association, or a trial court decision reduced to final judgment, as urged by the Developers.

The Legislature's use of the words "judicial decision" suggests the Association's interpretation is probably the one the Legislature intended. "Judicial" is a general term that refers equally to a trial court, appellate court, or a high court of review. (See Cal. Const., art. VI, § 1 ["The judicial

27

power of this State is vested in the Supreme Court, courts of appeal, and superior courts, all of which are courts of record."].)  Had the Legislature meant to exclude from the retroactive reach of section 5986 claims that had already been resolved in the trial court, it could easily have done this by inserting the words "trial court" in place of "judicial."  (See, e.g., *Manco Contracting*, *supra*, 45 Cal.4th at p. 203 [interpreting California's Uniform Foreign-Country Money Judgments Recognition Act; reasoning that "[i]f the Legislature had intended to restrict the meaning of 'final' " to refer "only to finality in the trial court, i.e., a judgment that is not interlocutory," "it could have easily added the phrase 'in the trial court' after 'final' "].)

Similarly, the Legislature's use of the word "decision" rather than "judgment" suggests it had a broader scope of tribunals in mind, since judgments are issued only by trial courts (see, e.g., Code Civ. Proc., § 577 ["A judgment is the final determination of the rights of the parties in an action or proceeding."]; *Aixtron v. Veeco Instruments Inc.* (2020) 52 Cal.App.5th 360, 384 [under the " ' "one final judgment rule," ' " " ' " 'an appeal may be taken only from the final judgment in an entire action' " ' "]), whereas courts of all levels issue decisions (*Vazquez v. Jan-Pro Franchising Internat.* (2021) 10 Cal.5th 944, 952–953 [referring to *Dynamex Operations W. v. Superior Court* (2018) 4 Cal.5th 903 as a "judicial decision"]; *Martinez v. Combs* (2010) 49 Cal.4th 35, 66 [describing *United States v. Silk* (1947) 331 U.S. 704, 713 as a "judicial decision"]; *In re Thomas* (2018) 30 Cal.App.5th 744, 761–762 [referring to " 'decisions' " of the California Courts of Appeal]).

However, although we find it likely the Legislature intended "final judicial decision on the merits" to have the meaning advanced by the Association, we cannot confidently reject the Developers' interpretation based solely on an examination of the statutory text.  Accordingly, we proceed to the

28

next step and consider the legislative history of section 5986. (*Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1162–1163 ["statutory language is not plain" where "[i]ts language does lend itself to plaintiff's interpretation, but . . . that is not the only reasonable interpretation . . . ."].)

   2.     *Step Two—Legislative History and Maxims of Construction*

        (i)     *Legislative History*

"If [a statute] is susceptible of multiple interpretations . . . we will divine the statute's meaning by turning to a variety of extrinsic sources, including the legislative history [citation], the nature of the overall statutory scheme [citation], and consideration of the sorts of problems the Legislature was attempting to solve when it enacted the statute [citation]." (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 770.) "In addition, an 'examination of the original text of the statute and the evolution of the language' of a statute that has been amended is 'useful in ascertaining its current meaning.' " (*Lopez*, *supra*, 215 Cal.App.4th at p. 1400, quoting *Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 586 (*Ailanto Properties*).)

As detailed above, legislative analyses of Senate Bill 326 explained that section 5986 was enacted to end a trend of developers taking advantage of their ability, early in the formation of condominium associations, to insert provisions into CC&Rs which make it more difficult for the association to sue them for construction defects. (Assem. Com. on Judiciary, Analysis of Sen. Bill 326, as amended June 24, 2019, p. 9; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill 326, as amended May 1, 2019, pp. 6–7.) The bill was meant to "ensure[ ] that developers cannot reap the benefit of having taken advantage of their participation in the creation of the HOA in this way." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill 326, as amended May 1, 2019, p. 7.) *Cambridge Point*,

29

the Massachusetts Supreme Court case, was cited favorably for its holding that developer-drafted conditions precedent to a suit that increased the difficulty of initiating litigation against developers contravened public policy. (Sen. Com. on Judiciary, Analysis of Sen. Bill 326, Mar. 27, 2019, p. 10.) *Branches* was offered as an example of a developer's successful employment of the disfavored defense. (Assem. Judiciary Com., Mandatory Information Worksheet on Sen. Bill 326, pp. 1–3.)

Subdivision (d) was proposed to make the statutory nullification of such provisions, and the defenses based on them, retroactive. (Sen. Com. on Judiciary, Analysis of Sen. Bill 326, Mar. 27, 2019, p. 10.) As originally drafted, the text of subdivision (d) of section 5986 stated: "This section applies to all governing documents, whether recorded before or after the effective date of this section, and applies retroactively to *any claims* initiated before the effective date of this section." (Sen. Amend. to Sen. Bill 326, Mar. 27, 2019, p. 6, original italics omitted; our italics added.)

The bill's author later proposed an amendment to subdivision (d) "strik[ing] out 'section' and insert[ing]: [']section, except if those claims have been resolved through an executed settlement, a final arbitration decision, or a final judicial decision on the merits.['] " (Sen. Com. on Judiciary, Analysis of Sen. Bill 326, Mar. 27, 2019, p. 13, amend. 21.)

An analysis report prepared for the Senate Committee on Judiciary explained the impetus for the proposed amendment:

> "As it appears in print, the bill would apply retroactively, not just to any governing documents sitting around out there, but also to pending construction defect claims. Even if it makes policy sense for the bill to nullify these self-serving provisions within existing HOA governing documents generally, this general rule becomes more problematic when applied to pending claims. Historically, this Committee has sought to avoid interfering with or altering the outcome of pending litigation. Nonetheless, as the

30

Massachusetts Supreme Court's decision [in *Cambridge Point*] suggests, these provisions raise such concern that the courts might well find them void as against public policy regardless of whether this bill passes. *The Committee might find retroactive application to pending claims appropriate under that narrow circumstance.*

"At the same time, the language in the bill is written so broadly that it could be interpreted to allow for the revival of lapsed claims or claims that have already been resolved on their merits. That this is not the bill's intent and the author proposes to offer an amendment in Committee that would limit the bill's retroactivity to claims that are not time-barred and that have not been resolved on their merits." (Sen. Com. on Judiciary, Analysis of Sen. Bill 326, Mar. 27, 2019, pp. 10–11, italics added.)

To address the issues set forth in the foregoing comments, amendments were proposed to "clarify that the bill's provisions regarding nullification of specified provisions within an HOA's governing documents *do not apply to claims* that are time-barred or *that have reached final resolution on their merits.*" (Sen. Com. on Judiciary, Analysis of Sen. Bill 326, Mar. 27, 2019, p. 11, italics added.)

The proposed amendment to subdivision (d) was approved in committee and voted into the bill on May 1, 2019. The amendment remained in Senate Bill 326 through passage by the Legislature without further change. (See § 5986, subd. (d).)

Two aspects of this history draw our attention. First, developer-drafted, prelitigation member vote requirements were viewed as clearly violative of public policy. Retroactive abrogation of defenses based on failure to comply with these requirements, even in the context of "pending litigation" or "pending claims," was considered appropriate under the circumstances. Second, subdivision (d) was amended to ensure the statute's retroactivity provision was appropriately circumscribed so it did not result in "reviv[ing]"

31

claims that had "reached final resolution on their merits." (Sen. Com. on Judiciary, Analysis of Sen. Bill 326, Mar. 27, 2019, p. 11.)

We believe the separation of powers doctrine lends clarity to the line the Legislature was attempting to draw in amending subdivision (d) to restrict the scope of its retroactive application. The separation of powers doctrine holds that one branch of the government cannot exercise essential powers that our state Constitution has delegated to another branch. (*Perez v. Roe 1* (2006) 146 Cal.App.4th 171, 176–177 (*Perez*).) "A core function of the Legislature is to make statutory law . . . . A core function of the judiciary is to resolve specific controversies between parties." (*Id.* at p. 177.) Thus, "[w]hen cases become final for separation of powers purposes, the Legislature may not . . . bind the courts with an after-the-fact declaration of legislative intent." (*Ibid.*) As the United States Supreme Court has explained in the context of the parallel federal separation of powers doctrine, "[w]hen retroactive legislation requires its own application in a case already finally adjudicated, it does no more and no less than 'reverse a determination once made, in a particular case.' " (*Plaut v. Spendthrift Farm, Inc.* (1995) 514 U.S. 211, 225 (*Plaut*); see *People v. Bunn* (2002) 27 Cal.4th 1, 5 (*Bunn*) [following *Plaut*, and finding *Plaut* "both consistent with California law and persuasive for state separation of powers purposes"].)

However, "[s]eparation of powers principles do not preclude the Legislature from amending a statute and applying the change to both pending and future cases, though any such law cannot 'readjudicat[e]' or otherwise 'disregard' judgments that are already 'final.' " (*Bunn, supra*, 27 Cal.4th at p. 17.) "Because the judicial branch consists of a hierarchy of courts—from district courts and appellate courts to the Supreme Court itself—a judgment has no conclusive effect for separation of powers purposes

32

until the time for appeal has passed, or an appeal has been pursued and the review process is completed. Therefore, separation of powers principles are not implicated, and a lower court decision has not been unconstitutionally altered, when a reviewing court applies a new retroactive statute to cases still pending on appeal." (*Perez, supra*, 146 Cal.App.4th at p. 179, citing *Plaut, supra*, 514 U.S. at pp. 226–227.) "[O]nly those decisions that represent '*the final word* of the [judicial] department as a whole,' as expressed by '*the last court in the hierarchy that rules on the case*' " are constitutionally protected from the effects of retroactive legislation. (*Bunn*, at p. 21.)

The Legislature is presumed to have been aware of the relevant law (*In re W.B.* (2012) 55 Cal.4th 30, 57) and of the limits of its powers (*Young v. Department of Fish & Game* (1981) 124 Cal.App.3d 257, 277). We infer from these presumptions and from the legislative history discussed above, that in amending subdivision (d), the Legislature was attempting to avoid overstepping the limits of its constitutional legislative authority while still allowing for the broadest possible scope of pending claims to be affected by section 5986. The Legislature's concern about the overbreadth of subdivision (d) as originally drafted, together with the statements that affecting "pending litigation" was acceptable under the "circumstances" while "reviv[ing]" claims that had been finally resolved was not, support this view. Likewise, that Senate Bill 326 was designed to "ensure[ ] that developers cannot reap the benefit of having taken advantage of their participation in the creation of the HOA . . . ," the citation to *Branches* in the legislative materials as an example of a developer benefitting from such a misuse of authority, and the expressed view that developer-inserted " '*poison pill*' " provisions violated public policy by making it more difficult for associations to hold developers accountable for construction defects, are all indications of legislative intent for section 5986

33

to affect pending construction defect litigation to the extent of its authority to do so.  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill 326, as amended May 1, 2019, p. 7; Assem. Judiciary Com., Mandatory Information Worksheet on Sen. Bill  326, pp. 1–2.)

We thus conclude from our analysis of the legislative history of section 5986 in general, and the amendment to subdivision (d) of section 5986 in particular, that the Legislature intended "final judicial decision" to refer to a judgment for which the time to appeal had passed, or, if an appeal was taken, had reached finality after completion of the process of appellate review.

(ii)  *Maxims of Construction*

This interpretation is further supported by the structure of subdivision (d), which establishes retroactivity as the general rule, and makes claims resolved through "final judicial decision on the merits" the exception.  At the second stage of statutory interpretation, we may consider maxims of construction.  (See *Lopez, supra,* 215 Cal.App.4th at p. 1411.)  One such principle holds that statutory exceptions are to be narrowly or strictly construed.  (See *Carter v. Cohen* (2010) 188 Cal.App.4th 1038, 1051 ["Exceptions to the general rule of a statute are to be strictly construed and, in interpreting exceptions to the general statute, courts include only those circumstances which are within the words and reason of the exception."]; *Maracich v. Spears* (2013) 570 U.S. 48, 60 ["An exception to a 'general statement of policy' is 'usually read . . . narrowly in order to preserve the primary operation of the provision.' "]; *C.I.R. v. Clark* (1989) 489 U.S. 726, 739 ["In construing provisions . . . in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision."].)

34

Applying this principle and construing "final judicial decision" narrowly supports the view that "final judicial decision" encompasses only those claims resolved to appellate finality. This interpretation results in fewer cases being excluded from the statute's retroactive reach, and thus serves subdivision (d)'s primary purpose of retroactivity. The Developers' interpretation, by contrast, excludes a greater range of cases from the statute's retroactive effects, frustrating the overall purpose of the statute and contravening the rule favoring a narrow interpretation of exclusionary clauses.

3. *Step Three—Reason, Practicality, and Common Sense*

After considering the statute's legislative history and the structure of subdivision (d), we are persuaded that "final judicial decision" means a decision that has been reduced to judgment and has reached finality after completion of the appellate process, or that has become final because the time to appeal has passed.

Although it is unnecessary to do so, we note that this interpretation is consistent with reason and common sense. (See, e.g., *Lopez*, *supra*, 215 Cal.App.4th at p. 1417 ["Although it is not necessary to do so, we confirm our interpretation of [the statute], by applying 'reason, practicality, and common sense to the language' of the statute."], citing *Ailanto Properties*, *supra*, 142 Cal.App.4th at p. 591 ["Although our review of the legislative history suffices to support our conclusion, applying 'reason, practicality, and common sense to the language at hand' confirms that conclusion."].)

Interpreting "final judicial decision" to encompass claims resolved to finality in the trial court, but to exclude claims pending on appeal, makes little sense. Doing so would create the possibility of judicial enforcement of a provision that our Legislature has already declared in the strongest possible terms—through explicit statutory directive—should be treated as null and

35

void.  It would also raise the potential for affirming a ruling that disposed of a case for noncompliance with such a provision, despite the legislative declaration that such defenses can no longer be asserted.  In practical terms, this would mean that associations chronologically advantaged because their claims, for whatever reason, were not reduced to final judgment by January 1, 2020, would be entitled to the full benefits of section 5986 and would see previously-dismissed claims restored, whereas associations whose claims were resolved before that point and were pending on appeal on January 1, 2020, would not.  We see little to be gained, as a matter of policy or pragmatics, from drawing such a distinction.  Accordingly, we decline to do so.

    4.     *Conclusion—Interpretation of "Final Judicial Decision on the Merits"*

Our examination of the text, legislative history, and structure of section 5986, subdivision (d), as confirmed by considerations of reason and common sense, leads us to conclude that a "final judicial decision" under subdivision (d) means a judgment for which the time to appeal had passed, or, if an appeal was taken, had reached finality after completion of the process of appellate review.  We have already found that "on the merits" does not encompass a claim disposed of for noncompliance with a condition precedent to litigation like the one contained in section 4.4.4.

Thus, the Association's claims had not been resolved by a "final judicial decision on the merits" when section 5986 became effective, and they are not excluded from the statute's retroactive reach.  Accordingly, subdivision (b) of section 5986 applies.  Under subdivision (b), "[a]ny limitation or precondition [in the governing documents of an association], including, but not limited to, requiring a membership vote as a prerequisite to . . . the board's commencement and pursuit of a claim . . . is unenforceable, null, and void.

36

The failure to comply with those limitations or preconditions, if only, shall not be asserted as a defense to any claim or action described in this section."

The trial court granted summary judgment based on the Developers' defense that the Association failed to comply with section 4.4.4 by filing its complaint and first amended complaint without first obtaining the consent of a majority of owners. Subdivision (b) abrogates this defense and renders the member vote precondition on which it was based null and void. As the judgment is now without a legal basis, we will reverse it.

## II.

### *Section 4.4.4 Violates Fundamental State Public Policy*

As an independent ground for reversal of the judgment, the Association argues that section 4.4.4, as interpreted by the trial court to require the Association to obtain member approval before filing suit and to disallow member approval by a later vote of ratification, violates fundamental state public policies. The Association notes that the trial court was compelled to follow *Branches*, which was controlling law at the time it ruled on the Developers' summary judgment motion. It urges that we should now reject the holding of *Branches* and follow *Aldea* instead.

We agree. As an independent basis for reversing the judgment, we conclude, like the court in *Aldea*, that section 4.4.4 "contravenes explicit legislative expressions of public policy." (*Aldea*, *supra*, 44 Cal.App.5th at p. 1077.) We also join *Aldea* in registering our disagreement with *Branches* to the extent it held otherwise.

Civil Code section 5975, subdivision (a), provides, in relevant part, that "[t]he covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the benefit of and bind all owners of separate interests in the development." "[C]ovenants

37

and restrictions in recorded declarations of common interest developments are presumptively reasonable [citation], and are enforceable 'unless they are wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit' [citation]." (*Villa De Las Palmas*, *supra*, 33 Cal.4th at p. 88.) "Equity will not enforce any restrictive covenant that violates public policy. [Citations.] Nor will courts enforce as equitable servitudes those restrictions that are arbitrary, that is, bearing no rational relationship to the protection, preservation, operation or purpose of the affected land." (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 381 (*Nahrstedt*); *Pinnacle*, *supra*, 55 Cal.4th at p. 239 ["Although *Nahrstedt* spoke specifically in terms of land use restrictions, its analysis logically extends to all covenants in a declaration, which by statute are also enforceable as equitable servitudes unless unreasonable."].)

In *Aldea*, the court examined a voting requirement, much like the one at issue here, that required a condominium association to obtain the consent of a majority of owners before filing a claim. (*Aldea*, *supra*, 44 Cal.App.5th at p. 1076.) The association failed to obtain owner consent prior to filing its demand for arbitration, but later obtained the approval of 99 percent of its members to continue with the arbitration. (*Ibid.*) The arbitrator granted the developer's motion to dismiss based on the association's failure to comply with the vote requirement prior to beginning arbitration, and the trial court confirmed the award. (*Ibid.*)

On appeal, Division Six of the Second Appellate District found the vote requirement, and the arbitral award enforcing it, violative of explicit legislative expressions of state public policy. (*Aldea*, *supra*, 44 Cal.App.5th at pp. 1077–1079.) The policies it identified included those supporting quality residential construction. (*Id.* at p. 1077, citing Health & Saf. Code, § 50001

38

[" 'housing is of vital statewide importance to the health, safety, and welfare of the residents of this state . . . .' "]; §§ 896 [listing construction defects for which the developer is liable], 897 [developer liable for defects not expressly listed], 941, subd. (a) [10-year statutory period in which to bring a construction defect action].)

The *Aldea* court also found the vote requirement unreasonable and unconscionable and thus violative of the prohibition in section 5975, subdivision (a), against enforcement of unreasonable provisions in CC&Rs, particularly as interpreted by the arbitrator to prohibit consent through ratification after the claim was filed. (*Aldea, supra,* 44 Cal.App.5th at p. 1077.) The provision gave the developer "veto power over the Association's claims in spite of the members' vote to proceed with the arbitration." (*Ibid.*) The court disagreed with *Branches* that such a requirement benefits members and " 'balance[s] the association's need to operate efficiently with the rights of its members to be informed and participate in decisions that could impact the association for years, if not decades, to come.' " (*Id.* at p. 1078, quoting *Branches, supra,* 26 Cal.App.5th at p. 758.) The *Aldea* court had a pithy response: "But the members voted to ratify the Association's decision to arbitrate. It is an odd benefit that deprives the members of the right to proceed with an arbitration they voted to undertake." (*Aldea, supra,* 44 Cal.App.5th at p. 1078.) The *Aldea* court further noted that the vote provision did *not* "inform the Association or its members of the devastating effect the failure to comply will have on its rights, or that the initial failure to comply, no matter how inadvertent, will be irremediable." (*Id.* at pp. 1078–1079.)

We agree with the *Aldea* court's discussion and adopt its reasoning. We find its assessment of state public policy particularly persuasive since it is

39

consonant with the legislative history of Senate Bill 326 and the concerns that motivated the Legislature to enact section 5986. The commentary in the relevant legislative analysis noted that at the time of the bill's authorship, common interest developments accounted for "approximately a quarter of the state's overall housing stock . . . ." (Sen. Com. on Judiciary, Analysis of Sen. Bill 326, Mar. 27, 2019, p. 5.) "[T]he laws overseeing such developments have a large impact on the population." (*Ibid.*) In this case alone, the Association stands for the interests of the inhabitants of 301 residential units. Within this context, the identified trend in developer-created impediments to construction defect suits by condominium associations becomes a matter of public welfare. The same legislative analyses looked askance at the notion that developers insert such provisions for the rational purpose of fostering informed decision-making. "[T]he fact that these provisions are limited to construction defect claims against the developer suggests that more is afoot." (*Id.* at p. 9.)

We conclude, like *Aldea*, that the requirement in section 4.4.4 that prohibited the Association from instituting litigation against the Developers without first obtaining the consent of a majority of the owners violates fundamental state policy by making it more difficult for the Association to hold Developers accountable for construction defects. We also find section 4.4.4 unreasonable, unconscionable and violative of the fundamental state policy against unreasonable servitudes insofar as it requires strict compliance as a precondition to suit and prohibits members from providing their consent later through a vote ratifying a board decision to file suit. Thus, even if we were to conclude that section 5986 did not apply retroactively to the Association's claims, we would reverse the judgment on the basis that section 4.4.4 violates fundamental public policy.

*Developers' Remaining Arguments*

The Developers oppose reversal on certain grounds we have not yet addressed.

First, the Developers contend the Association, in its opening brief on appeal, failed to challenge the trial court's ruling that the complaint and first amended complaint were invalid as a matter of law for failure to comply with section 4.4.4, and the Association has therefore forfeited this challenge to the judgment. Because we find the Developers' contention to be an obvious mischaracterization of the Association's appellate brief, we need not and do not address it further.

Next, the Developers advance a complicated argument that we summarize as follows: the Association's original complaint was unauthorized for failure to comply with section 4.4.4; the 10-year statute of repose under section 941, subdivision (a), started to run no later than July 10, 2007 (the date of recordation of the notice of completion), and because the original complaint was invalid, it continued to run to expiration before the February 15, 2018 ratification vote; the ratification vote was therefore ineffective to cure the original complaint's invalidity; because subdivision (e) of section 5986 does not extend statutes of repose, it is now too late for the Association to file a new complaint based on the February 15, 2018 ratification vote; therefore, the Association's complaint remains unauthorized and invalid, and we should affirm the judgment.

The chief, but not the only, problem with this logic emerges at step one. Since we have concluded section 5986 applies retroactively to the Association's claims, its original complaint can no longer be characterized as unauthorized for noncompliance with section 4.4.4. Since the remainder of

the Developers' argument depends on the validity of this first step, we reject the argument in its entirety.

Finally, the Developers contend that in the event we reverse the trial court's grant of summary judgment, we should remand for further proceedings so they can conduct discovery to determine whether the Association amended its CC&Rs to add a new provision with a valid member consent precondition to suit. We decline to do so. The Developers cite no authority that would support allowing them this opportunity. Essentially, the Developers seek to conduct additional discovery under Code of Civil Procedure section 437c, subdivision (h), but this provision only applies to the party opposing summary judgment; the Developers were the moving party. The Developers also fail to indicate how evidence of a new voting provision in the CC&Rs would be relevant to the summary judgment motion they already filed, which was based on section 4.4.4.

## DISPOSITION

The judgment is reversed and the matter is remanded with directions that the trial court vacate its order granting the Developers' motion for summary judgment and issue a new order denying that motion. The Association is entitled to its costs on appeal.

DO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


GUERRERO, J.

43